STEVE W. BERMAN (*pro hac vice*)
steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

MARTIS ANN ALEX (SBN 77903)
malex@labaton.com
DANIEL R. LEATHERS (*pro hac vice*)
dleathers@labaton.com
BRIAN R. MORRISON (*pro hac vice*)
bmorrison@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| JASON SHAPIRO and ANDREW FREITAS, on behalf of themselves and those similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>FORD MOTOR COMPANY,<br><br>      Defendant. | No. 2:15-cv-09200-AB-MRW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT  FORD MOTOR COMPANY'S MOTION TO DISMISS**<br><br>Date:  June 27, 2016<br>Time:  10:00 a.m.<br>Place:  Courtroom 4<br>Judge: Hon. André Birotte, Jr. |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................... 1

II. BACKGROUND ...................................................................................... 4

III. ARGUMENT ........................................................................................... 7

    A. Legal Standard ............................................................................... 7

    B. Plaintiffs Allege Sufficient "Injury-in-Fact" to Confer Article III Standing .................................................................................. 8

        1. Ford did not disclose the deadly safety Defect in its owner manuals. ........................................................................ 8

        2. Plaintiffs adequately plead injury-in-fact sufficient to confer Article III standing. ...................................................... 10

        3. Plaintiffs also adequately allege diminution in value. .................. 12

    C. Plaintiffs Adequately Allege That Ford Had a Duty to Disclose the Alleged Safety Defect ............................................................ 12

        1. Ford has a duty to disclose the Defect because it poses an unreasonable safety risk. .............................................................. 14

        2. Ford has a duty to disclose the Defect based on Ford's exclusive knowledge thereof (*i.e.*, Ford is in a superior position to know about the Defect and the safety concerns associated with it). ........................................................................ 16

        3. Ford has a duty to disclose the Defect due to concealment. ......................................................................... 19

    D. Plaintiffs Do Not Base Their UCL "Unfair Prong" Claim On A Failure to Remedy ..................................................................... 20

    E. Plaintiffs' Request for Injunctive Relief is Not Barred by Preemption or Primary Jurisdiction ......................................... 20

    F. Ford's Argument Concerning Other Affected Vehicles Is Flawed and Is More Properly Addressed on a Motion for Class Certification ................................................................................. 23

IV. CONCLUSION ..................................................................................... 24

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

5
*In re Adobe Sys. Privacy Litig.*,
   66 F. Supp. 3d 1197 (N.D. Cal. 2014)........................................................ 18

6

7
*Apodaca v. Whirlpool Corp.*,
   2013 WL 6477821 (C.D. Cal. Nov. 8, 2013) ........................................... 16

8

9
*Asghari v. Volkswagen Grp. of Am., Inc.*,
   42 F. Supp. 3d 1306 (C.D. Cal. 2013).................................... 9, 12, 18, 19

10

11
*Astiana v. Dreyer's Grand Ice Cream, Inc.*,
   2012 WL 2990766 (N.D. Cal. July 20, 2012) ......................................... 24

12
*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ...................................................................... 22

13

14
*Belville v. Ford Motor Co.*,
   13 F. Supp. 3d 528 (S.D. W. Va. 2014) .................................................. 22

15

16
*Birdsong v. Apple, Inc.*,
   590 F.3d 955 (9th Cir. 2009) ....................................................... 11, 12, 15

17

18
*In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*,
   153 F. Supp. 2d 935 (S.D. Ind. 2001) ..................................................... 21

19

20
*Briehl v. GMC*,
   172 F.3d 623 (8th Cir. 1999) ........................................................... 11, 12

21

22
*Bruno v. Quten Research Inst., LLC*,
   280 F.R.D. 524 (C.D. Cal. 2011).............................................................. 24

23
*Cardenas v. NBTY, Inc.*,
   870 F. Supp. 2d 984 (E.D. Cal. 2012) .................................................... 23

24

25
*Chamberlan v. Ford Motor Co.*,
   314 F. Supp. 2d 953 (N.D. Cal. 2004).................................... 3, 20, 21, 22

26

27
*Clancy v. Bromley Tea Co.*,
   308 F.R.D. 564 (N.D. Cal. 2013) ............................................................ 23

28

*Corson v. Toyota Motor Sales, U.S.A., Inc.*,
   2013 WL 10068136 (C.D. Cal. July 18, 2013) ........................................................ 19

*Cuviello v. City & Cnty. of San Francisco*,
   940 F. Supp. 2d 1071 (N.D. Cal. 2013) ................................................................. 7

*Daugherty v. Am. Honda Motor Co.*,
   144 Cal. App. 4th 824 (2006) .............................................................................. 13

*Ehrlich v. BMW of N. Am., LLC*,
   801 F. Supp. 2d 908 (C.D. Cal. 2010) ......................................................... 14, 19

*Eisen v. Porsche Cars N. Am., Inc.*,
   2012 WL 841019 (C.D. Cal. Feb. 22, 2012) ......................................................... 15

*Elias v. Hewlett-Packard Co.*,
   2014 WL 493034 (N.D. Cal. Feb. 5, 2014) ..................................................... 17, 18

*Elias v. Hewlett-Packard Co.*,
   950 F. Supp. 2d 1123 (N.D. Cal. 2013) .................................................. 15, 16, 17

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) .............................................................................. 8

*Falk v. GMC*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) ........................................................ *passim*

*Garcia v. Kashi Co.*,
   43 F. Supp. 3d 1359 (S.D. Fla. 2014) ................................................................. 23

*Gray v. Toyota Motor Sales, U.S.A.*,
   2012 WL 313703 (C.D. Cal. Jan. 23, 2012) ......................................................... 18

*Grodzitsky v. Am. Honda Motor Co.*,
   2013 WL 2631326 (C.D. Cal. June 12, 2013) ...................................................... 23

*Guido v. L'Oreal, USA, Inc.*,
   2013 WL 454861 (C.D. Cal. Feb. 6, 2013) ......................................................... 23

*Hofmann v. Fifth Generation, Inc.*,
   2015 WL 5440330 (S.D. Cal. Mar. 18, 2015) ...................................................... 18

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
   285 F.R.D. 573 (E.D. Cal. 2012) ................................................................. 16, 17

*Kearney v. Hyundai Motor Am.*,
   2010 WL 8251077 (C.D. Cal. Dec. 17, 2010)......................................................... 14

*Keegan v. Am. Honda Motor Co.*,
   838 F. Supp. 2d 929 (C.D. Cal. 2012)............................................................. 13, 14

*Kelley v. Crosfield Catalysts*,
   135 F.3d 1202 (7th Cir. 1998) ......................................................................... 8

*Lee v. Toyota Motor Sales, U.S.A., Inc.*,
   992 F. Supp. 2d 962 (C.D. Cal. 2014)................................................................ 11

*Lilly v. Ford*,
   2002 WL 84603 (N.D. Ill. Jan. 22, 2002) ...................................................... 21, 22

*Marsikian v. Mercedes Benz USA, LLC*,
   2009 WL 8379784 (C.D. Cal. May 4, 2009)............................................. 16, 17, 19

*In re MyFord Touch Consumer Litig.*,
   46 F. Supp. 3d 936 (N.D. Cal. 2014)....................................................... 14, 17, 18

*Peel v. BrooksAmerica Mortg. Corp.*,
   788 F. Supp. 2d 1149 (C.D. Cal. 2011).............................................................. 12

*Philips v. Ford Motor Co.*,
   2016 WL 693283 (N.D. Cal. Feb. 22, 2016)........................................................ 22

*Route v. Mead Johnson Nutrition Co.*,
   2013 WL 658251 (C.D. Cal. Feb. 21, 2013) ........................................................ 24

*Smith v. Ford Motor Co.*,
   749 F. Supp. 2d 980 (N.D. Cal. 2010), *aff'd*, 462 F. App'x 660 (9th
   Cir. 2011)......................................................................................... 15

*Solarz v. DaimlerChrysler Corp.*,
   2002 WL 452218 (Pa. Com. Pl. Mar. 13, 2002) ................................................... 22

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ........................................................................ 8

*Tait v. BSH Home Appliances Corp.*,
   2011 WL 3941387 (C.D. Cal. Aug. 31, 2011) ...................................................... 9

*Taragan v. Nissan N. Am., Inc.*,
   2013 WL 3157918 (N.D. Cal. June 20, 2013) ...................................................... 11

*In re Toyota Corp. Unintended Acceleration Mktg., Sales Practices, &*
   *Prods. Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010)............................................................ *passim*

*In re Toyota Motor Corp.*,
   790 F. Supp. 2d 1152 (C.D. Cal. 2011)................................................... 10, 12

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods.*
   *Liab. Litig.*,
   959 F. Supp. 2d 1244 (C.D. Cal. 2013) ................................................... 11

*Whitson v. Bumbo*,
   2009 WL 1515597 (N.D. Cal. Apr 16, 2009)......................................... 11

*Williams v. Cnty. of Alameda*,
   26 F. Supp. 3d 925 (N.D. Cal. 2014)........................................................ 8

*Williams v. Yamaha Motor Corp., U.S.A.*,
   106 F. Supp. 3d 1101 (C.D. Cal. 2015)............................................. 15, 16

*Willis v. Buffalo Pumps Inc.*,
   34 F. Supp. 3d 1117 (S.D. Cal. 2014) ................................................. 14

*Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*,
   135 F.3d 658 (9th Cir. 1998) ............................................................... 7

## STATUTES

35 U.S.C. § 122................................................................................... 19

1

### I.  INTRODUCTION

2          In the past several years alone, at least fourteen people have died and many

3    more have sustained life-threatening injuries caused by deadly carbon monoxide

4    emissions from their cars that were equipped with Keyless Fobs.  Those vehicles were

5    not equipped with an automatic engine shutoff to ensure that the vehicle's engine did

6    not continue to emit deadly carbon monoxide long after the car was parked ("Auto-

7    Off").  As a result, innocent drivers, families, and bystanders suffered from carbon

8    monoxide poisoning.  Not one of those deaths or injuries would have occurred if the

9    cars had been equipped with Auto-Off.

10         At all relevant times, defendant Ford Motor Company ("Ford") was well aware

11   of the deadly safety risks inherent in a *Keyless Fob system that lacks Auto-Off* (the

12   "Defect").  As early as the 2009 Lincoln MKS, Ford installed an automatic shut-off

13   system for its remote-start vehicles to shut off the engine if the vehicle is left running

14   in pre-start mode in order to limit deadly carbon monoxide emissions.[1]

15         Additionally, on November 1, 2011, Ford filed a patent application to address

16   the dangerous carbon monoxide risks resulting from Keyless Fobs.  The application

17   sought to avoid the situation wherein "a vehicle operator may unintentionally leave the

18   vehicle with the engine idling," which Ford acknowledged was becoming increasingly

19   common given quiet engine technology.  Ford proposed a system that would

20   automatically shut down an idling engine after a specified duration of time after the

21   driver had exited the car.  Ford's patent expressly recognized that idling may occur in

22   enclosed spaces, "such as an indoor garage."

23         In the wake of mounting complaints and avoidable injuries needlessly caused by

24   carbon monoxide poisoning from vehicles that lack Auto-Off, Ford has installed Auto-

25   Off on *some* but not all of its more recent cars.  For example, Ford installed Auto-Off

26   on the 2014 and 2015 Lincoln MKS models, but not on any of the earlier MKS

27   _____

28   [1] In a remote-start vehicle, a driver can use an electronic fob to start the engine
     remotely to warm or cool the vehicle before entering.

1    vehicles.  Purchasers of Ford vehicles with Auto-Off can rest assured that their
2    families are protected from deadly carbon monoxide poisoning.
3        However, a purchaser of the 2013 Lincoln MKS has no such protection, as
4    evidenced by the tragic case of Rina and Pasquale Fontanini, a couple from Highland
5    Park, Illinois.  Rina and Pasquale parked their 2013 Lincoln MKS in their garage one
6    night, but unbeknownst to them the engine continued to run, filling their home with
7    deadly carbon monoxide.  Their son, a lieutenant in the Highland Park Fire
8    Department, found the couple dead the following day from carbon monoxide
9    poisoning.  If the couple had owned the 2014 Lincoln MKS rather than the 2013
10   model, they would not have died from carbon monoxide poisoning.  Ford chose not to
11   fix the Defect in earlier models or even to disclose its existence to consumers, despite
12   knowing about it.
13       Unlike with traditional physical keys, where a driver is assured that the engine
14   must be off if he parks the car and walks away with the key in hand, Keyless Fobs
15   have nothing to do with shutting off the engine.  As Ford has recognized, the potential
16   for carbon monoxide poisoning from a Keyless Fob-equipped car designed without
17   Auto-Off is amplified by the modern-day quiet engine technology that renders
18   vehicles nearly silent even when the engine is turned on.  Consequently, many drivers
19   have parked and left their cars, and later returned to discover the engine still running.
20       Each Plaintiff alleges that he purchased or leased a Keyless Fob vehicle from
21   Ford that he otherwise would not have purchased or leased, or paid more for it than he
22   otherwise would have paid, if Ford had disclosed the Defect.  Plaintiffs bring various
23   state law claims seeking economic damages for their overpayments, as well as
24   injunctive relief to stop Ford's ongoing deceptive marketing, to remedy the safety
25   Defect, and to notify class members about the defective nature of their vehicles.
26       Now, in its Motion to Dismiss, Ford argues that the owner manuals show
27   Plaintiffs were not defrauded, Plaintiffs suffered no economic injury, and they lack
28   Article III standing.  Furthermore, Ford argues that it had no duty to disclose the

Defect.  Ford also argues that Plaintiffs' request for injunctive relief is barred by preemption and primary jurisdiction.  Further still, Ford argues that Plaintiffs cannot assert claims relating to other car models (with the same Defect) that Plaintiffs did not purchase or lease.  Simply stated, Ford's motion fails as a matter of law.

*First*, Plaintiffs do not allege that they received or relied on the Ford owner manuals before leasing or purchasing their vehicles, so the manuals are of no consequence to their claims.  Equally important, the owner manuals are not properly considered on a motion to dismiss, and in any event, they do not reasonably disclose the Defect.  At most, the manuals introduce a factual dispute that cannot be resolved at the pleadings stage.

*Second*, Plaintiffs allege that they already suffered actual economic loss and therefore have Article III standing.  Ford's reliance on cases where the plaintiffs did not allege actual injury—physical or economic—is therefore unavailing.

*Third*, Plaintiffs adequately allege that Ford had a duty to disclose the Defect. The duty to disclose exists here because the lack of Auto-Off poses a genuine safety risk, because Ford had exclusive or superior knowledge of the Defect, and because Ford concealed the Defect.  To be sure, Ford filed for a patent nearly six years ago to remedy the same safety defect described in Plaintiffs' Complaint, and Ford has installed Auto-Off in some but not all of its more recent vehicles.

*Fourth*, Plaintiffs' request for injunctive relief is not barred by preemption or primary jurisdiction.  Tellingly, the very arguments on preemption and primary jurisdiction that Ford makes here were expressly rejected by the courts in *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953 (N.D. Cal. 2004) (a case which Ford actually litigated as a defendant), and in *In re Toyota Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.* ("*Unintended Acceleration MDL*"), 754 F. Supp. 2d 1145 (C.D. Cal. 2010) (a noteworthy vehicle defect class action from this district).  Ford fails to meet its burden of establishing an "actual" conflict between the requested relief and the National Traffic and Motor Vehicle Safety Act of 1966 (the

1   "Safety Act"), particularly in light of the presumption against preemption in motor

2   vehicle safety cases.  Additionally, Ford's argument that the Court should not hear

3   Plaintiffs' claims under the doctrine of primary jurisdiction is unavailing because

4   Plaintiffs' claims are within "the conventional competence of the courts" and do not

5   require any specialized consideration by the National Highway Transportation Safety

6   Administration ("NHTSA").

7           *Finally*, Ford argues that Plaintiffs cannot represent unnamed class members

8   who have purchased or leased other affected Ford models that have the same Defect as

9   Plaintiffs' vehicles.  Yet, binding decisions from California federal courts make clear

10  that this argument is better suited for the class certification stage.

11          For these reasons and others described more fully below, the Court should deny

12  Ford's motion in its entirety.

## II.    BACKGROUND

14          The Keyless Fobs are marketed as the ultimate driving convenience.  Drivers

15  can keep the Keyless Fobs in their pockets or bags and can start the car by pressing a

16  button on the dashboard without having to fumble for a traditional physical key.  *See*

17  ¶ 2.[2]  On cold or rainy days, Keyless Fobs are a convenience for drivers who wish to

18  quickly enter the vehicle.  *Id.*

19          However, this convenience has resulted in deadly consequences.  Reasonable

20  drivers, including Plaintiffs, can misunderstand the role of the Keyless Fob in turning

21  off the vehicle.  With traditional physical keys, once a driver removed the key from

22  the ignition switch, the engine could no longer operate.  ¶ 3.  Drivers knew that if they

23  removed the key from the vehicle, the engine was off.  But Keyless Fobs operate very

24  differently.  Unlike with traditional keys, the Keyless Fob has nothing to do with

25  turning off the engine.  ¶ 6.  Engines no longer turn off simply because the car is

26  parked and the Keyless Fob is removed from the vehicle.  *Id.*  For Plaintiffs' vehicles,

27

28  _____
    [2] Except where otherwise noted, references to "¶__" are to paragraphs in the Class
    Action Complaint (Dkt. No. 1).

as with the Affected Vehicles listed in Exhibit 1 to the Class Action Complaint ("Complaint"), the driver can stop the vehicle, put it in park, and exit with the Keyless Fob, but the engine can continue to run until the gas tank is empty, no matter how far away the driver goes from the car, and no matter how long the engine is running. *Id.*

Keyless Fobs are often offered as part of an "upgrade" or "technology" package that costs consumers additional money. ¶ 8. In vehicles that come with a Keyless Fob as standard equipment, the cost of the hardware and technology is built into the vehicle price. In either case, Plaintiffs and other consumers pay additional money for the Keyless Fobs. *Id.* But this added convenience comes with a dangerous safety risk because Ford has failed to institute Auto-Off on the Affected Vehicles. ¶ 12.

Tragically, as detailed in the Complaint, many drivers have not been fortunate enough to return to their parked cars to find the engines still running—instead, they and their families were exposed to deadly levels of carbon monoxide that seeped into their homes after the engine continued to run in the garage. Many innocent families have been devastated by carbon monoxide poisoning even in just the past six months.

A young mother parked her car in the garage and was awakened in the middle of the night by her thirteen-month-old son screaming. She and her son would have died from carbon monoxide poisoning had they stayed in their home just twenty minutes longer. ¶ 18.

A father in Issaquah, Washington, parked the family minivan in the garage, and the family of six was later rushed to the hospital for emergency treatment for carbon monoxide poisoning. The seventeen-month-old baby required three days of intensive treatment in a hyperbaric chamber, and three of the responding firefighters also required medical attention. ¶ 18.

Earlier, a college professor in Queens, New York, parked her car in her garage and woke up the next morning with permanent brain damage caused by carbon monoxide poisoning. Her partner was dead. ¶ 21.

1    Unfortunately, these are not isolated stories.  The Complaint details *at least*

2  fourteen wholly avoidable deaths and many more serious injuries—all from carbon

3  monoxide poisoning, and all of which would have been prevented if the vehicles had

4  Auto-Off.  ¶ 17.[3]

5    Since the time that Ford first marketed the Affected Vehicles, and at the time

6  each Plaintiff purchased or leased an Affected Vehicle, the Keyless Fob system lacked

7  Auto-Off and posed a serious risk of carbon monoxide poisoning.  ¶ 153.  At the same

8  time, Ford was in a superior position to know about the lack of Auto-Off in its

9  Affected Vehicles and the unreasonable safety hazard created by the lack of Auto-Off.

10  ¶¶ 152-53.  As alleged in the Complaint, Ford's superior knowledge of the Defect

11  arises through a variety of sources that include select news reports, recalls, patent

12  applications, personal injury lawsuit filings, NHTSA complaints, non-binding NHTSA

13  proposals, and Ford's partial implementation of Auto-Off.  ¶¶ 103-50.  Notably, since

14  2009, Ford has installed an automatic shut-off system on some (but not all) of its

15  vehicles to limit deadly carbon monoxide emissions.  ¶¶ 132-39, 144-50.  Moreover,

16  on November 1, 2011, Ford filed a patent application to address the dangerous carbon

17  monoxide risks resulting from Keyless Fobs.  ¶ 114, Ex. 7.  Nonetheless, Ford has

18  concealed or failed to disclose to consumers the lack of Auto-Off and related safety

19  risks, inducing consumers to purchase or lease one of the Affected Vehicles and to pay

20  a premium price in the process.  ¶ 153.

21    Plaintiffs purchased or leased various Ford vehicles equipped with Keyless Fobs

22  (the "Affected Vehicles"), not knowing that their vehicles lacked Auto-Off.  ¶¶ 41, 56.

23  Prior to purchasing or leasing the vehicles, they reviewed Ford pre-sale materials, but

24  none of those pre-sale materials warned them that their vehicles lacked Auto-Off or

25

26    ───────────────────
      [3] Plaintiff's counsel have learned of at least five more deaths since filing the
27  Complaint in November 2015, bringing the total number of avoidable deaths to
    nineteen.  If the Court requests or requires further allegations about the safety hazard
28  posed by the Defect, Plaintiff's counsel could and would detail the circumstances of
    these additional deaths.

that the lack of Auto-Off poses a serious safety risk.  ¶¶ 47, 62.  Although Plaintiffs have been fortunate enough not to suffer carbon monoxide poisoning, they nevertheless have each experienced the Defect—they have each parked their vehicles, removed the Keyless Fob, walked away, and later discovered the vehicles' engines were still running.  ¶¶ 49, 64.  Plaintiffs would not have purchased or leased the vehicles, or would have paid less, had they known about the lack of Auto-Off and related safety risk.  ¶¶ 54, 70.

## III.    ARGUMENT

### A.    Legal Standard

Ford's Motion to Dismiss the Complaint fails as a matter of law, and the Court should deny the motion in its entirety.  A motion to dismiss challenges the legal sufficiency of the claims alleged.  While the complaint must plead enough facts to render the claims plausible on their face, a claim has plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Cuviello v. City & Cnty. of San Francisco*, 940 F. Supp. 2d 1071, 1079 (N.D. Cal. 2013).[4]  "On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party."  *Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

Additionally, under Federal Rule of Civil Procedure 9(b), the fraudulent omission claims asserted by Plaintiffs "can succeed without the same level of specificity required by a normal fraud claim."  *Unintended Acceleration MDL*, 754 F. Supp. 2d at 1189 (Rule 9(b) requirements relaxed for fraudulent omission claims "because '[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place, and content of an event that (by definition) did not occur would effectively gut

---

[4] Unless otherwise indicated, internal quotation marks and citations omitted.

1    state laws prohibiting fraud-by-omission'") (quoting *In re Whirlpool Corp. Front-*

2    *Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009)).

3    As explained more fully below, Plaintiffs have alleged sufficient factual

4    allegations that "plausibly suggest an entitlement to relief." *See Starr v. Baca*, 652

5    F.3d 1202, 1216 (9th Cir. 2011).[5]

6    **B.     Plaintiffs Allege Sufficient "Injury-in-Fact" to Confer Article III Standing**

7    Ford argues that Plaintiffs have failed to allege any facts showing a cognizable

8    injury, improperly citing a single sentence taken out of context from a 500-plus page

9    manual that Plaintiffs did not allege they received or relied on.  Ford also argues that

10   Plaintiffs lack standing because the vehicles performed as expected.  Not true.

11   Plaintiffs did not expect that the Keyless Fob ignition system had a safety defect that

12   can cause deadly carbon monoxide poisoning that kills or injures innocent drivers,

13   families, and bystanders.  But Ford misconstrues Plaintiffs' allegations, and also relies

14   on case law where none of the plaintiffs experienced a manifestation of the alleged

15   defects or suffered any physical or economic injury.  Plaintiffs here plead sufficient

16   facts establishing the necessary injury-in-fact for Article III standing.

17       **1.     Ford did not disclose the deadly safety Defect in its owner manuals.**

18   Ford argues that the owner manuals disclose the material risks associated with

19   the lack of Auto-Off.  Motion to Dismiss ("MTD") at 8-10.  This line of reasoning

20   goes astray for several reasons.  *First*, the owner manuals are not the proper subject of

21   judicial notice.  *See* Plaintiffs' Opp. to Ford's Request for Judicial Notice.[6]  *Second*,

22

23       [5] Moreover, dismissal "without leave to amend is not appropriate unless it is
     clear … that the complaint could not be saved by amendment." *Eminence Capital,*

24   *LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see also* Fed. R. Civ. P.
     15(a)(2).  Plaintiffs respectfully request leave to amend if necessary.

25       [6] Ford's citation to the original *Lassen* complaint is improper, as "it is well-

26   established that an amended pleading supersedes the original pleading." *Williams v.*
     *Cnty. of Alameda*, 26 F. Supp. 3d 925, 936 (N.D. Cal. 2014) (refusing to consider facts

27   cited from prior version of complaint that was subsequently amended); *see also Kelley*
     *v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998).  At any rate, contrary
     to Ford's insinuations, at no point does the original complaint state that Plaintiffs

28   received or relied on the manuals in making their decisions to purchase or lease the
     vehicles.

the cited owner manuals are not "pre-sale" materials, and Ford would be hard pressed to contend otherwise (*i.e.*, a typical purchaser does not review an *owner* manual before purchasing a vehicle). *See Tait v. BSH Home Appliances Corp.*, 2011 WL 3941387, at *2-3 (C.D. Cal. Aug. 31, 2011) (rejecting argument that product manuals disclosed the alleged defect, since the manuals were provided to consumers after they bought the products); *see also Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1327 n.74 (C.D. Cal. 2013) ("Many customers would not have performed an internet search before beginning a [product] search.  Nor were they required to do so."). Plaintiffs do not allege that they received, reviewed, or relied on the manuals prior to purchasing or leasing their vehicles.

*Third*, the manuals *do not* reasonably disclose the Defect.  Plaintiffs allege that Ford should have warned, "Once the engine is started, the engine will continue to run even if the vehicle is parked and even if the keyless ignition fob is removed from the vehicle."  ¶ 153.  Ford claims that it made that disclosure because, it says, the owner manuals state, "Once the vehicle has started, the vehicle will remain running until being turned off by the start button, even if the passive key is no longer found in the vehicle."  MTD at 8.  Ford's citation to that language is wholly misleading.

Neither Plaintiff alleges that he received or reviewed the 569-page or 468-page owner manuals before leasing or purchasing the vehicles.  *See* Dkt. 26-2 (Ex. 1, at 8; Ex. 2 at 8).  The language quoted by Ford is a single sentence plucked from the middle of a 500-plus page manual under the heading "Fast Restart," and does not refer to typical driving conditions.  Rather, "Fast Restart" is a rarely used system available on some Ford models that allows drivers who do not have the Keyless Fob with them to nevertheless restart the vehicles within 10 to 20 seconds of shutting off the engine.  In that rare instance, where the driver does not have the Keyless Fob, and thus restarts the engine without the Fob in proximity, the engine will continue to run until the driver presses the "start button" again.  That feature is entirely inapplicable to the ordinary driver experience where the driver has the Keyless Fob, parks the car after driving,

and exits the car with the Keyless Fob in hand.  There is no warning that the car engine can continue to run in that common scenario.

Likewise, while the manuals warn owners not to "start [the] vehicle in a closed garage or in other enclosed areas," MTD at 9, that warning has no relation to the Defect.  A generalized warning about the dangers of carbon monoxide fumes or starting the car in an enclosed space does not disclose that drivers can park the car and take the Keyless Fob with them but the engine can continue to run indefinitely.  None of the cited manual language improperly cited by Ford discloses that, in ordinary driving conditions when a driver has the Keyless Fob (*i.e.*, not in the one-off "Fast Restart" scenarios where a driver does not have possession of the Fob), the engine can continue to run even if the drivers park the vehicles and leave with the Keyless Fob.

### 2.    Plaintiffs adequately plead injury-in-fact sufficient to confer Article III standing.

Ford's argument that Plaintiffs lack the necessary injuries to bring any claims is wholly without merit, particularly at this stage of the litigation where "general factual allegations of injury resulting from the defendant's conduct may suffice."  *See Unintended Acceleration MDL*, 754 F. Supp. 2d at 1160.

First, Plaintiffs allege that they already have suffered *actual* economic losses. Plaintiffs allege that they overpaid for the vehicles because the price of the defective Keyless Fob was built into the vehicles' prices.  *See* ¶ 39.  The Complaint is replete with allegations that the Defect has diminished the value of Plaintiffs' vehicles.  *See id.* ("because defective vehicles are worth less than vehicles without defects, Plaintiffs' Affected Vehicles have diminished in value"); *see also In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("A vehicle with a defect is worth less than one without a defect.").  Because Plaintiffs allege that they already suffered economic losses, they necessarily have Article III standing.  Indeed, the Court in the *Unintended Acceleration MDL* expressly held that "overpayment, loss in value, or loss of usefulness is sufficient to confer standing."  754 F. Supp. 2d at 1162.

1    While Ford seems to acknowledge that allegations of economic injury may

2    suffice to demonstrate injury-in-fact, it nevertheless argues that Plaintiffs' allegations

3    are insufficient here.  Ford incorrectly relies on cases where, unlike the case at hand,

4    none of the plaintiffs had actually experienced the alleged defect.  *See Birdsong v.*

5    *Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (where Apple iPod was allegedly

6    defective because it could, theoretically, cause hearing loss to consumers who turned

7    the volume too loudly, plaintiffs did not claim that they, or anyone else, had suffered

8    or were substantially certain to suffer hearing loss); *Briehl v. GMC*, 172 F.3d 623, 628

9    (8th Cir. 1999) (upholding trial court's dismissal of complaint where plaintiffs never

10   experienced alleged defect with ABS brakes).

11   Ford's reliance on *Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962

12   (C.D. Cal. 2014), is equally inapplicable.  The plaintiffs there brought various

13   consumer claims against Toyota concerning an automatic pre-collision braking

14   function, but did not allege that they or any other consumers had ever experienced a

15   problem with the braking system.  *Id.* at 967-68.  The plaintiffs merely pointed to a

16   third-party study opining that even though the vehicle was rated a "Top Safety Pick"

17   by the third party, the pre-collision braking function did not qualify for the "advanced"

18   rating.  *Id.* at 969.  The theoretical defect in *Lee*, which the plaintiffs did not allege

19   caused economic, physical or any other injury to themselves or anyone else, is a far

20   cry from this litigation where Plaintiffs allege a safety defect that has resulted in at

21   least 14 deaths and many more serious injuries.

22   Ford's remaining footnoted citations similarly fall flat.  *See Taragan v. Nissan*

23   *N. Am., Inc.*, 2013 WL 3157918, at *5 (N.D. Cal. June 20, 2013) (plaintiffs did not

24   actually experience manifestation of defect); *Whitson v. Bumbo*, 2009 WL 1515597, at

25   *4 (N.D. Cal. Apr 16, 2009) (finding no standing where plaintiff had not experienced

26   any manifestation of defect and had not claimed that she "actually used or was harmed

27   by any defect" in child seat); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales*

28

1    *Practices & Prods. Liab. Litig.*, 959 F. Supp. 2d 1244, 1249 (C.D. Cal. 2013) (on

2    motion for summary judgment, no evidence of manifestation of alleged defect).

3         **3.    Plaintiffs also adequately allege diminution in value.**

4         Ford relies on the same cases—where none of the plaintiffs alleged they had

5    experienced manifestations of the defect—to suggest that Plaintiffs' claims for

6    diminution in value are "too conclusory."  MTD at 12-13; *see Birdsong*, 590 F.3d at

7    961; *Briehl*, 172 F.3d at 628.  Contrary to Ford's suggestions, case law is clear that at

8    the pleading stage, Plaintiffs adequately allege diminution in value merely by detailing

9    the safety Defect and alleging an economic loss resulting from that same Defect.  As

10   the Court explained in the *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1166, "[a]s

11   long as [the plaintiffs] do not simply allege that their Toyota vehicles are 'defective,'

12   but rather offer detailed, non-conclusory factual allegations of the product defect, the

13   economic loss injury flows from the plausibly alleged defect at the pleadings stage."

14   Here, Plaintiffs sufficiently plead a dangerous safety defect that has resulted in at least

15   14 deaths and many more severe injuries.  Plaintiffs also sufficiently plead that they

16   experienced manifestations of the Defect and that their vehicles have diminished in

17   value as a result.  Therefore, Plaintiffs' diminution in value claim should be allowed to

18   proceed.

19   **C.   Plaintiffs Adequately Allege That Ford Had a Duty to Disclose the Alleged Safety Defect**

20        "In alleging fraud or mistake, a party must state with particularity the

21   circumstances constituting fraud or mistake.  [K]nowledge … may be alleged

22   generally."  Fed. R. Civ. P. 9(b).  Omissions need not be pled with the same degree of

23   specificity.  *See Falk v. GMC*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007) (time,

24   place, and content of omissions need not be pled with same specificity as affirmative

25   misrepresentations); *see also Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d

26   1149, 1159-60 (C.D. Cal. 2011); *Asghari*, 42 F. Supp. 3d at 1306, 1325.  "All that is

27   necessary is 'identification of the circumstances constituting fraud so that the

28

defendant can prepare an adequate answer from the allegations.'"  *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 938 (C.D. Cal. 2012).

In this case, Plaintiffs aver *the who* (Ford), *the what* (the Keyless Fob system design of the Affected Vehicles lacks Auto-Off and poses a serious risk of carbon monoxide poisoning), *the when* (beginning at the time the Affected Vehicles were introduced to market and continuing through the time of sale of each vehicle), *the where* (pre-sale marketing materials), *the how* (failure to disclose the alleged safety defect known to Ford, which induced consumer purchases of Affected Vehicles), and *the why* (Ford had exclusive/superior knowledge of material information about a safety defect, yet concealed or failed to disclose the Defect in order to induce Plaintiffs and Class Members to pay a higher price to purchase or lease its Affected Vehicles rather than competitors' vehicles or vehicles with physical keys).  *See*, *e.g.*, ¶ 153.

In a nondisclosure case like this one, the plaintiff can state a cause of action when the defendant has a duty to disclose a material fact.  *See Falk*, 496 F. Supp. 2d at 1094-95.  A manufacturer generally has a duty to disclose a safety defect.  *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 836 (2006); *see also Keegan*, 838 F. Supp. 2d at 941.  Moreover, a duty to disclose arises in any of the following circumstances:  "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact."  *Falk*, 496 F. Supp. 2d at 1095 (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997)).  In this case, Plaintiffs allege that Ford has exclusive or superior knowledge of a safety defect that was unknown to Plaintiffs at the time of their purchase or lease of the Affected Vehicles, and Ford actively concealed material facts about Auto-Off.

The Complaint amply alleges a safety defect and the fact that Ford was under a duty to disclose it, but failed to do so.  *See* ¶¶ 19, 27, 99, 152-53, 156, 180-81, 206-07.

Plaintiffs also identify and attach examples of Ford's pre-sale marketing materials (*e.g.*, sales brochures) where the Defect could have been disclosed but was not. *See* ¶¶ 46-48, 61-63, Exs. 4, 5. Thus, Plaintiffs plead the circumstances of the alleged omission with specificity, such that Ford's "Rule 9(b)" challenge is without merit.

### 1. Ford has a duty to disclose the Defect because it poses an unreasonable safety risk.

"[T]he Ninth Circuit has recognized that California law imposes on manufacturers a general duty to disclose defects in their products relating to safety issues." *Willis v. Buffalo Pumps Inc.*, 34 F. Supp. 3d 1117, 1132 (S.D. Cal. 2014). In particular, Defendants are "under a duty to disclose a known defect in a consumer product when there are safety concerns associated with the product's use." *Keegan*, 838 F. Supp. 2d at 941; *see also Kearney v. Hyundai Motor Am.*, 2010 WL 8251077, at *6-7 (C.D. Cal. Dec. 17, 2010); *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 916 (C.D. Cal. 2010); *Falk*, 496 F. Supp. 2d at 1094. Ford concedes—as it must—that it has a duty to disclose defects that pose an unreasonable safety risk. MTD at 15. But Ford contends that the lack of a safety feature does not pose an unreasonable safety risk. Ford is wrong.

The lack of a safety feature can and often does pose an unreasonable safety risk. *See Kearney*, 2010 WL 8251077, at *6-7 (on motion to dismiss, finding that lack of functional airbag sensors raised material safety concerns); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 957 (N.D. Cal. 2014) (on motion to dismiss, finding that defective infotainment system, with additional safety features, raised material safety concerns). Keyless Fob vehicles that lack Auto-Off create an unreasonable safety risk, and a reasonable consumer would consider that risk to be material. At a minimum, "materiality is generally a question of fact." *Id.* (quoting *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 333 (2011)).[7]

---

[7] Ford's materiality challenge is disingenuous at best, given that Ford advocated the importance of Auto-Off in its 2011 patent application, and anticipated the danger of leaving an engine running in "a substantially enclosed space." ¶ 114, Ex. 7.

1    Ford's materiality argument also fails because this case deals with more than

2    just the lack of a safety feature.  Plaintiffs allege that the design of the Keyless Fob

3    ignition system for Affected Vehicles poses a serious safety risk.  That design enables

4    the Fob to be removed from the vehicle while toxic emissions continue to run

5    unabated for an extended duration.  GM recalled some 50,000 cars to avoid just such a

6    "Safety Risk" ("The 2011-2013 MY Volt vehicles were not equipped with software

7    that automatically shuts off a vehicle after a predetermined amount of time.").  ¶¶ 108-

8    11.  The GM "Safety Risk" was described as follows:  "If the gas engine runs for long

9    periods of time within an enclosed space, such as a garage, carbon monoxide could

10    build up in the enclosed space and potentially cause injury." ¶ 108.  Here, too,

11    Plaintiffs allege a material safety risk (carbon monoxide poisoning) from a Keyless

12    Fob system that does not automatically shut off a vehicle after a predetermined

13    amount of time, once the driver exits the vehicle with his/her Fob.

14    Ford nonetheless argues that Plaintiffs' safety concerns are too "speculative" or

15    "hypothetical," citing cases in which there were no allegations that any consumer

16    actually suffered personal injury from the alleged defects.  MTD at 16-17.[8]  Moreover,

17    each of those cases presented an insufficient causal nexus between the alleged defect

18    and the hypothetical safety issue.  This case is markedly different.

19    To establish a duty to disclose based on a safety issue, the complaint may allege

20    either:  (i) an instance of physical injury; or (ii) a sufficient nexus between the alleged

21    defect and a safety issue.  *See Williams v. Yamaha Motor Corp., U.S.A.*, 106 F. Supp.

22    3d 1101, 1112 (C.D. Cal. 2015) (finding that plaintiffs sufficiently pled safety issue

23    _____

24    [8] *See, e.g., Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1136-37 (N.D. Cal. 2013) (plaintiffs failed to allege that power supply posed safety risk where no
25    allegation that anyone's computer actually caught fire and insufficient nexus between alleged defect and safety issue); *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 990 (N.D. Cal. 2010), *aff'd*, 462 F. App'x 660 (9th Cir. 2011) (recognizing that mere risk
26    of getting stranded when car fails to start is too speculative to constitute safety risk; no reports that anyone was ever injured from alleged defect); *Eisen v. Porsche Cars N.*
27    *Am., Inc.*, 2012 WL 841019, at *4 (C.D. Cal. Feb. 22, 2012) (same); *Birdsong*, 590 F.3d at 961 (safety risk speculative where plaintiffs did not allege that anyone suffered
28    hearing loss from using iPods, or that anyone used iPods in risky manner).

supporting duty to disclose based on possibility of fire as logical outcome of corroded exhaust parts);[9] *see also Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *9 (C.D. Cal. Nov. 8, 2013) (ruling that complaint sufficiently alleged safety issue based on logical possibility of moisture affecting wiring); *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL 8379784, at *6-7 (C.D. Cal. May 4, 2009) (denying motion to dismiss where plaintiff alleged that air intake systems were susceptible to clogging, which plausibly could lead to engine failure).  The safety concerns here are all too real, as Ford knows from the instances of personal injury already alleged in the operative complaint. *See* ¶¶ 103-07, 125-26.  Additionally, Plaintiffs allege a sufficient nexus between the Defect (a Keyless Fob system designed in a manner that the engine continues to run indefinitely after the Fob is removed) and the safety issue (carbon monoxide poisoning from a running engine).[10]  The danger is not hypothetical here.

Simply put, Plaintiffs adequately plead that Ford omitted material facts, *i.e.*, a defect posing genuine safety concerns, which supports a duty to disclose.

### 2. Ford has a duty to disclose the Defect based on Ford's exclusive knowledge thereof (*i.e.*, Ford is in a superior position to know about the Defect and the safety concerns associated with it).

A defendant has a duty to disclose when it has exclusive knowledge of material facts not known to the plaintiffs, *i.e.*, when defendant is in a superior position to know such facts.  *See*, *e.g.*, *Falk*, 496 F. Supp. 2d at 1094-95; *see also Marsikian*, 2009 WL 8379784, at *6.  The "exclusive knowledge" standard is not construed literally.  For example, in *Johnson v. Harley-Davidson Motor Co. Group, LLC*, 285 F.R.D. 573, 583 (E.D. Cal. 2012), the defendants argued that a "duty to disclose even a known, material fact does not exist unless the defendant has exclusive knowledge of that fact."

---

[9]  In *Williams*, this Court distinguished cases like *Elias*, 950 F. Supp. 2d at 1137, in which the plaintiff failed to explain how a lack of power supply could subsequently cause a computer fire.  *See id.* at 1111.

[10]  Heightened exposure to carbon monoxide emissions can affect drivers, passengers, and bystanders near Affected Vehicles wherever those vehicles may be parked; enclosures will exacerbate the severity of the exposure.  In other words, the Affected Vehicles create the hazard, and enclosures make it worse.

But *Johnson* explained that "courts do not apply 'exclusivity' with such rigidity. Rather, exclusivity is analyzed in part by examining whether the defendant had 'superior' knowledge…."[11]  And the district courts in *In re MyFord Touch Consumer Litigation*, *Elias v. Hewlett-Packard Co.*, *Falk*, and *Marsikian* have said the same.[12]

Here, Plaintiffs allege that Ford has a duty to disclose the Defect based on its exclusive knowledge thereof.  ¶¶ 152-53.  In other words, Ford is in a superior position to know about the lack of Auto-Off and related safety concerns.  Ford's knowledge arises at least through:  (1) certain news reports of injuries and deaths from Keyless Fob vehicles that lack Auto-Off (¶¶ 103-07); (2) recalls of similar Keyless Fob vehicles that lack an Auto-Off mechanism (¶¶ 108-11); (3) patent applications covering Auto-Off systems (¶¶ 112-17); (4) personal injury lawsuit filings for Keyless Fob vehicles that lack an Auto-Off mechanism (¶¶ 118-24); (5) consumer complaints filed with NHTSA regarding Keyless Fob vehicles (¶¶ 125-26); (6) review of non-binding NHTSA proposals (¶¶ 127-31);[13] and (7) Ford's partial implementation of Auto-Off (¶¶ 132-39, 144-50).[14]

---

[11] *Id.* ("Since Defendant was in a *superior position* to know of its defective engines, Plaintiffs properly allege that Defendant had exclusive knowledge of material facts not known to Plaintiffs.") (emphasis added).

[12] *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 960 (explaining that "exclusivity is not applied with rigidity" and "is analyzed in part by determining whether the defendant has *superior knowledge*") (emphasis added); *Elias v. Hewlett-Packard Co.*, 2014 WL 493034, at *9 (N.D. Cal. Feb. 5, 2014) ("*Elias II*") (explaining that "courts look to whether the defendant had *superior knowledge* of the defect and do not rigidly require literal exclusivity") (emphasis added); *Falk*, 496 F. Supp. 2d at 1096-97 ("Since, as plaintiffs argue, GM 'was in a *superior position* to know' that its speedometers might fail, plaintiffs successfully state a CLRA claim for omission of a material fact which lay within GM's exclusive knowledge.") (emphasis added); *Marsikian*, 2009 WL 8379784, at *6 (allegations that defendant "was in a *superior position* to know" material facts support duty to disclose based on defendant's exclusive knowledge) (emphasis added).

[13] On December 12, 2011, NHTSA published a Notice of Proposed Rulemaking, which has never been acted on or implemented, outlining the dangers of Keyless Fobs. NHTSA recognized that "driver[s] may not immediately know that the propulsion system has not been turned off" and drivers "may have died because of carbon monoxide poisoning from their vehicles."  ¶ 130.

[14]  Since at least 2009, Ford had knowledge of the need for Auto-Off, and worked on auto-off technology internally—starting with remote-start vehicles (and continuing later with other Keyless Fob models, including the 2014/2015 Lincoln MKS) —in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Despite Ford's contrary view, sporadic information on the Internet or in other media about the dangers of Keyless Fob vehicles does not cancel out Ford's superior knowledge. *See Asghari*, 42 F. Supp. 3d at 1327 n.74 ("Many customers would not have performed an internet search before beginning a [product] search. Nor were they required to do so."); *see also Falk*, 496 F. Supp. 2d at 1096 (same); *Unintended Acceleration MDL*, 754 F. Supp. 2d at 1192 ("While prospective [] customers could have been tipped off to the possibility of [sudden unintended acceleration] by researching past complaints filed with NHTSA, many customers would not have performed such a search, nor would they be expected to."); *Elias II*, 2014 WL 493034, at *9 ("customers cannot 'be expected to seek facts which they h[ave] no way of knowing exist []'"). "Plaintiffs have sufficiently alleged that [defendant] knew significantly more about the alleged [] defect than the limited information" available to the public. *See Unintended Acceleration MDL*, 754 F. Supp. 2d at 1192; *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 960 ("Even if the public – and therefore Plaintiffs – were aware of some problems with [the in-vehicle-dash control systems], that does not establish that either the public or Plaintiffs knew or should have known of the severity of the problems. . . ."); *Hofmann v. Fifth Generation, Inc.*, 2015 WL 5440330, at *8-9 (S.D. Cal. Mar. 18, 2015) (information from a magazine article cannot be imputed to consumers). At most, the nature of information in the public domain "is a question of fact not properly resolved on a motion to dismiss." *In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1230 (N.D. Cal. 2014).[15]

---

order to limit carbon monoxide emissions in pre-start situations; but Ford opted not to implement Auto-Off in most of its Keyless Fob systems for Affected Vehicles. ¶¶ 132-39, 144-50.

[15] Ford cites *Gray v. Toyota Motor Sales, U.S.A.*, 2012 WL 313703 (C.D. Cal. Jan. 23, 2012), wherein the parties disputed a Prius' fuel economy. There, the court recognized that the vehicle's fuel economy was readily observable under daily driving conditions, and the topic was given national attention by the mainstream media. *See id.* at *8-9. Unlike fuel economy, the Defect here is not readily observable to consumers in everyday driving conditions. Furthermore, despite sporadic reports over the years, Ford's Keyless Fob design has not been given national attention by the mainstream media.

In sum, prospective purchasers of the Affected Vehicles were not expected to research internet reports, NHTSA complaints, NHTSA proposals, product recalls, personal injury lawsuits, or patent applications.  These customers could not be expected to seek out facts about a dangerous Keyless Fob design of which they were unaware.  And even if Plaintiffs had learned something about the safety defect prior to purchase (they did not), Plaintiffs sufficiently allege that Ford knew significantly more about it.[16]  Plaintiffs, therefore, adequately plead that Ford was in a superior position to know of the Defect and its associated safety risks.

### 3.  Ford has a duty to disclose the Defect due to concealment.

Automakers can actively conceal an alleged defect in a variety of ways, such as by withholding relevant facts (*see, e.g.*, *Ehrlich*, 801 F. Supp. 2d at 919); or correcting the defect in some but not all instances (*see, e.g.*, *id.*; *Marsikian*, 2009 WL 8379784, at *6); or denying "the existence of a defect or a fix" (*Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 10068136, at *6 (C.D. Cal. July 18, 2013); *see also Asghari*, 42 F. Supp. 3d at 1330-31; *Unintended Acceleration MDL*, 754 F. Supp. 2d at 1192). According to the Complaint, Ford concealed the Defect in at least two ways:  (i) by affirmatively exercising its option to file a confidential patent application regarding Auto-Off technology in November 2011, which prevented interested parties from reviewing material facts for at least 18 months until May 2013 (¶ 114, Ex. 7);[17] and (ii) by quietly re-designing some but not all vehicle systems to cure the Defect (¶¶ 132-39, 144-50).  In short, Plaintiffs sufficiently plead active concealment.

---

[16] Ford offers owner manuals as a potential source of disclosure, but to no avail. Judicial notice and incorporation by reference are improper here for the reasons set forth in Plaintiffs' concurrently-filed Opposition to Ford Motor Company's Request for Judicial Notice.  Moreover, the owner manuals are not pre-sale disclosures reviewed by Plaintiffs prior to purchase (nor would a prospective purchaser be expected to review an owner manual before purchasing a vehicle).

[17] Patent applicants need not keep patent applications confidential (*see* 35 U.S.C. § 122), but Ford chose to do so here, putting corporate profits ahead of safety.

**D.     Plaintiffs Do Not Base Their UCL "Unfair Prong" Claim On A Failure to Remedy**

Plaintiffs do not intend to base their UCL "unfair prong" claim on Ford's failure to "provide a permanent remedy to fix the Defect." ¶ 194.  To the extent the phrasing of Paragraph 194 of the Complaint indicates otherwise, the Court may disregard or strike that Paragraph.  To be clear, Plaintiffs allege that Ford's conduct is unfair because Ford sold unsafe vehicles and failed to disclose material facts about a known safety defect despite having a duty to disclose those facts.  Ford's failure to remedy the Defect may support Plaintiffs' request for equitable relief under the UCL—it does not, however, constitute the basis of Plaintiffs' claim under the "unfair prong" of the UCL.

Ford's argument that Plaintiffs' request for injunctive relief is barred by preemption and primary jurisdiction also fails, and is more fully addressed below in Section E.

**E.     Plaintiffs' Request for Injunctive Relief is Not Barred by Preemption or Primary Jurisdiction**

Ford argues that Plaintiffs' request for injunctive relief is barred by conflict preemption.  Ford fails to mention that in *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953 (N.D. Cal. 2004), a vehicle defect class action brought against Ford, the court rejected the exact same argument.  *Unintended Acceleration MDL*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010), another vehicle defect class action decided in this same district.  In the *Unintended Acceleration MDL*, this Court rejected an auto manufacturer's argument that claims for injunctive relief, including a recall, must be dismissed by application of conflict preemption and the doctrine of primary jurisdiction.  Ford's motion should be rejected here for the same reasons articulated by the court in *Chamberlan* and by other decisions that Ford ignores.

First, Ford's argument that Plaintiffs' requested relief is preempted by the Safety Act falls flat, just as it did in *Chamberlan* and the *Unintended Acceleration MDL*.  Conflict preemption only exists when "state law conflicts with federal law,

either … because it [i]s impossible to comply with both laws or … because state law stands as an obstacle to accomplishing the purposes of federal law." *Unintended Acceleration MDL*, 754 F. Supp. 2d at 1195.  California federal courts have consistently held that motor vehicle safety "is an area of law traditionally regulated by the states," and that the presumption against preemption therefore applies to vehicle defect class actions.  *See id.* at 1196; *Chamberlan*, 314 F. Supp. 2d at 958, 965-67 ("Motor vehicle safety is an area of traditional State police power.").

Because there is a presumption against preemption in this case, Ford "bears the burden of showing that it was Congress' clear and manifest intent to preempt State law."  *Id.* at 962.  As such, Ford must establish that there is an "an actual conflict" between Plaintiffs' requested relief and the Safety Act.  It is not enough that the relief sought "*might* conflict with some future action of NHTSA as it investigates the alleged defect[s] at issue."  *Unintended Acceleration MDL*, 754 F. Supp. 2d at 1198-1200 (emphasis added).  "[T]o constitute an actual conflict, the state law at issue must conflict with the intent of Congress in a specific and concrete way."  *Id.* at 1198.

In the *Unintended Acceleration MDL*, Judge Selna rejected the same argument advanced by Ford here.  Judge Selna emphasized that "a real and substantial possibility of conflict is insufficient to warrant dismissal on preemption grounds."  *Id.* Significantly, the *Chamberlan* court also rejected the same argument, concluding there that Ford had failed to overcome the presumption against preemption without evidence of an "actual conflict."  314 F. Supp. 2d at 965, 967.  So too here.  Ford has failed to bear its burden to establish that Plaintiffs' requested injunctive relief actually conflicts with the Safety Act.

Ford's reliance on *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig. ("Bridgestone")*, 153 F. Supp. 2d 935 (S.D. Ind. 2001), and the unpublished decision in *Lilly v. Ford*, 2002 WL 84603 (N.D. Ill. Jan. 22, 2002), is unavailing.  In the *Unintended Acceleration MDL*, Judge Selna criticized those same courts for their overly broad application of conflict preemption, explaining that those courts erred by

failing to apply the presumption against preemption.  754 F. Supp. 2d at 1196, 1199.
The district court in *Chamberlan* similarly criticized the reasoning of *Bridgestone* and
*Lilly*.  314 F. Supp. 2d at 965, 967.  The decisions Ford cites remain as unavailing now
as when they were rejected by other California federal courts.

Second, in the *Unintended Acceleration MDL*, Judge Selna rejected the same
primary jurisdiction argument advanced by Ford here, concluding that the claims, just
like Plaintiffs' claims in this litigation, did "not arise under the Safety Act or NHTSA
regulations" and were instead "based on California statutes … and general contract
and tort principles."  754 F. Supp. 2d at 1200.[18]  The claims were therefore "within the
conventional competence of the courts."  *Id.*; *see also Belville v. Ford Motor Co.*, 13
F. Supp. 3d 528, 547 (S.D. W. Va. 2014) (holding that court was "well equipped to
handle" claims based upon breach of warranty and state law causes of action).

Ford's reliance on a 14-year-old unpublished decision from the Pennsylvania
Court of Common Pleas, *Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218, at *3-4
(Pa. Com. Pl. Mar. 13, 2002), is unpersuasive.  *Solarz* has only been cited once within
the Ninth Circuit, in a case that declined to apply primary jurisdiction in an auto defect
class action against Ford.  *See Philips v. Ford Motor Co.*, 2016 WL 693283, at *12
(N.D. Cal. Feb. 22, 2016).

Ford's remaining citation to *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753
(9th Cir. 2015), a case concerning an agency interpretation of complicated cosmetic
product labels, is inapposite.  There, multiple district courts had already invoked
primary jurisdiction only because "[d]etermining what chemical compounds may be
advertised as natural on cosmetic product labels is a particularly complicated issue that
Congress ha[d] committed to the FDA."  *Id.* at 761.  *Astiana* is therefore easily
distinguishable from this case where Plaintiffs do not bring claims under, or challenge

---

[18] In the *Unintended Acceleration MDL*, the court explained that the doctrine of
primary jurisdiction is only appropriate "where enforcement of the claim requires the
resolution of issues, which, under a regulatory scheme, have been placed within the
special competence of an administrative body."  754 F. Supp. 2d at 1199.

any, NHTSA regulation, and the core claim—that Plaintiffs are entitled to recover economic and injunctive relief for Ford's failure to disclose the Defect—is not the type of "unusual technical or policy expertise" requiring agency intervention. *See Guido v. L'Oreal, USA, Inc.*, 2013 WL 454861, at *6 (C.D. Cal. Feb. 6, 2013).

**F.    Ford's Argument Concerning Other Affected Vehicles Is Flawed and Is More Properly Addressed on a Motion for Class Certification**

Ford argues that the Complaint must be dismissed as to all Ford Affected Vehicles other than the models Plaintiffs purchased or leased, though Plaintiffs allege that each one of those vehicles suffers from precisely the same Defect.[19] ¶ 6. The case law does not support Ford. In fact, the Court rejected the same argument just three years ago in a vehicle defect class action. In *Grodzitsky v. Am. Honda Motor Co.*, 2013 WL 2631326, at *4 (C.D. Cal. June 12, 2013), the plaintiffs purchased defective Honda vehicles, including the Odyssey, Element, Accord, and Pilot vehicle models, but sought to represent a class "that include[d] six other models, spread out over a twelve year period." The plaintiffs argued that they had standing to bring claims "over all models that contained the same defect." *Id.* The Court rejected the defendant's argument that the plaintiffs lacked standing "to sue over products they did not purchase," concluding that it was "ill-suited to a motion to dismiss," and explaining that it was better suited for the class certification stage. *Id.*

The weight of authority confirms that Ford's argument is premature, particularly when the Affected Vehicles each suffer from the same Defect.[20] *See Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 571 (N.D. Cal. 2013) (concluding that "[d]eciding at the pleading stage that a plaintiff cannot represent a class who purchased any different products than the plaintiff seems unwarranted"); *Cardenas v. NBTY, Inc.*, 870

---

[19] Plaintiff withdraws claims relating to Ford's electric vehicles, including the 2012 to 2015 Ford Focus Electric vehicles, as those were erroneously listed in the Exhibit of Affected Vehicles.

[20] Ford's additional citation to *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359 (S.D. Fla. 2014), should be rejected since its position on this same issue is directly in conflict with the position shared by the majority of California federal courts.

F. Supp. 2d 984, 991 (E.D. Cal. 2012) (rejecting *dicta* from *Johns v. Bayer Corp.*, 2010 WL 476688 (C.D. Cal. Feb. 9, 2010), as unpersuasive, and adopting majority view that issue depends not on standing but on class representation); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 530 (C.D. Cal. 2011) ("District courts in California routinely hold that the issue of whether a class representative may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.").  Other California federal courts in the minority have also explained that, so long as there is "sufficient similarity between the products [the named plaintiffs] did purchase and those that they did not," the argument is better addressed at the class certification stage.[21]  *See Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *13 (N.D. Cal. July 20, 2012) (finding that even though food products at issue may have different ingredients, plaintiffs challenged "the same basic mislabeling practice across different product flavors").

As a result, at the pleadings stage, this Court should reject Ford's motion to dismiss other Affected Vehicle models from the case.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court to deny Ford's motion to dismiss.

---

[21] In *Route v. Mead Johnson Nutrition Co.*, 2013 WL 658251, at *5 n.4 (C.D. Cal. Feb. 21, 2013), the Court explained that the plaintiffs may have standing to assert claims for other products if the products each suffer from the same defect and the "only differences between the products [are] not germane to [the plaintiffs'] claims."

1 | Dated:  April 18, 2016                    HAGENS BERMAN SOBOL SHAPIRO LLP

2

3 |                                           By /s/ Steve W. Berman
     Steve W. Berman (*pro hac vice*)
     HAGENS BERMAN SOBOL SHAPIRO LLP
4 |                                           1918 Eighth Avenue, Suite 3300
     Seattle, WA 98101
5 |                                           Telephone: (206) 623-7292
     Facsimile: (206) 623-0594
6 |                                           steve@hbsslaw.com

7 |                                           Lee M. Gordon (SBN 174168)
     Elaine T. Byszewski (SBN 222304)
8 |                                           HAGENS BERMAN SOBOL SHAPIRO LLP
     301 N. Lake Avenue, Suite 203
9 |                                           Pasadena, CA 91101
     Telephone: (213) 330-7150
10 |                                          Facsimile: (213) 330-7152
     lee@hbsslaw.com
11 |                                          elaine@hbsslaw.com

12 |                                          LABATON SUCHAROW LLP

13 |                                          Martis Ann Alex (SBN 77903)
     Daniel R. Leathers (*pro hac vice*)
14 |                                          Brian R. Morrison (*pro hac vice*)
     LABATON SUCHAROW LLP
15 |                                          140 Broadway
     New York, NY 10005
16 |                                          Telephone: (212) 907-0700
     Facsimile: (212) 818-0477
17 |                                          malex@labaton.com
     dleathers@labaton.com
18 |                                          bmorrison@labaton.com

19 |                                          *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on April 18, 2016, I electronically filed the foregoing

3

document using the CM/ECF system which will send notification of such filing to the

4

e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail

5

Notice List.

6

7

_/s/ Steve W. Berman_
STEVE W. BERMAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28